[Cite as *Sharp v. Ohio Dept. of Job & Family Servs.*, 2019-Ohio-5397.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
|  |  | JUDGES: |
| JULIE SHARP, GUARDIAN, ON | : | Hon. W. Scott Gwin, P.J. |
| BEHALF OF DANIEL SHARP, WARD | : | Hon. Craig R. Baldwin, J. |
|  | : | Hon. Earle E. Wise, J. |
| Plaintiff-Appellant | : |  |
|  | : |  |
| -vs- | : | Case No. 2019 CA 00047 |
|  | : |  |
| OHIO DEPARTMENT OF JOB AND | : |  |
| FAMILY SERVICES | : | OPINION |
|  |  |  |
| Defendant-Appellee |  |  |

CHARACTER OF PROCEEDING:     Civil appeal from the Licking County Court
                             of Common Pleas, Case No. 18 CV 1093

JUDGMENT:                    Reversed and Vacated

DATE OF JUDGMENT ENTRY:      December 24, 2019

APPEARANCES:

For Plaintiff-Appellant              For Defendant-Appellee

S. ADELE SHANK                       THERESA DIRISAMER
3380 Tremont Road                    Assistant Attorney General
Suite 270                            30 East Broad Street
Columbus, OH 43221                   26th Floor
                                     Columbus, OH 43215-3400

*Gwin, P.J.*

{¶1}    Appellant appeals the May 29, 2019 judgment entry of the Licking County Court of Common Pleas affirming an administrative decision issued by appellee the Ohio Department of Job and Family Services ("ODJFS") on behalf of the Ohio Department of Medicaid.

*Facts & Procedural History*

{¶2}    Appellant Julie Sharp is the mother and legal guardian of Daniel Sharp. Daniel is nineteen years old and has been diagnosed with Type 1 diabetes, autism, and epilepsy without status epilepticus.  Daniel receives Medicaid Services through the Ohio Department of Developmental Disabilities ("ODODD").  Daniel currently receives fifty-one hours of private duty nursing ("PDN") services per week.   He began receiving these services through the ODODD waiver program and Interim Healthcare in 2016, but he has received PDN services under various programs since he was three years old.   On December 17, 2017, the Licking County Board of Developmental Disabilities conducted a Nursing Task Assessment ("NTA") for Daniel's annual redetermination of eligibility for services.

{¶3}    ODODD reviewed the information submitted by the Licking County Board of Developmental Disabilities and denied the request for fifty-one hours of PDN per week on the basis that such services were not medically necessary.  ODODD notified appellant via letter on February 8, 2018 of its intent to terminate PDN services effective February 26, 2018, and stated Daniel's need for care could be met through Homemaker/Personal Care ("HPC") providers with medication certification and nursing task delegation.

{¶4}    Appellant appealed the decision of ODODD to terminate the PDN services. A hearing officer conducted an audio hearing on April 2, 2018.   Donna Patterson ("Patterson"), Medicaid Health Systems Administrator 2, stated ODODD received a 485 Plan of Care document for Daniel, listing diagnoses of autism, Type 1 diabetes without complications, and epilepsy, nonintractable and without status epilepticus.  ODODD also received the NTA completed by the Licking County Board of Developmental Disabilities.

{¶5}    Patterson testified that, based upon the documentation received from Licking County, Daniel needs to have his glucose checked every two hours, his insulin pump adjusted accordingly, his vital signs checked, his pump site changed every three days, and have insulin administered, via the insulin pump, the dosage of which is based upon his glucose reading.  As Patterson looked at the sixty day NTA summary, she noted: Daniel had no falls, no urgent care visits, and no ER visits during the sixty days; Daniel lives at home with his family; and the caregiver had no questions, complaints, or concerns. Patterson was concerned that Daniel's 485 plan was inadequate because it did not contain a written, documented order from a physician as to a sliding scale of insulin. However, Patterson made clear it is not appellant's responsibility to make sure the 485 plan of care is correct.

{¶6}    Specifically with regards to Daniel's insulin, Patterson stated the insulin order in the plan of care states 100 units per milliliter, pump solution, continuous subcutaneous delivery via the insulin pump with the doses adjusted per finger-stick blood sugar.  Further, Patterson testified that the documentation reflects Daniel's blood sugars are checked every two hours and adjustments are made based upon the blood sugar level and/or there are snacks given to Daniel with varying levels of carbohydrates to

prevent hypoglycemia. Patterson noted the documentation indicates the PDN is primarily provided while Daniel is at school and, during this time, his blood sugar was checked routinely every two hours and snacks were provided at the carbohydrate level based upon his finger-stick blood sugar, "as well as there were modifications made to the insulin pump dosage."

{¶7} Patterson stated Daniel's insulin administration can be provided by HPC providers with a Level 1 and Level 3 certification, so long as the insulin is provided through a subcutaneous injection or pump. Patterson testified the NTA and 485 plan of care submitted support this determination due to the stability of Daniel's condition. Patterson stated that even if the HPC service is utilized, there would be no service change for Daniel until an appropriate provider was located to meet his needs.

{¶8} Julie Sharp testified Daniel is a brittle diabetic and his glucose can vary wildly. Mrs. Sharp stated Daniel is receiving PDN services five days per week, nine hours per day, and has had the same nurse for the past twelve years.

{¶9} Doug Sharp, Daniel's father, testified the combination of Daniel's conditions, along with an extremely low IQ of 59, puts Daniel in a situation where he is unable to share with his caregiver his condition, specifically with regards to either low or high blood sugar. Thus, the family relies on the independent decision-making of a skilled nurse to make a decision on whether or not his symptoms are related to blood sugar, an autism behavior, or epilepsy. Mr. Sharp testified Daniel needs someone at the nurse skill level to make the right decision at the moment. Mr. Sharp explained the reason why there is no sliding scale included in the physician's orders as it relates to insulin is because the decisions are made in real-time, based upon the physical symptoms the nurse sees at

the time, in addition to Daniel's activity levels.  Mr. Sharp stated the family previously attempted to use delegated nursing for respite care for Daniel, but could not find a provider willing to provide the care because of the level of complexity of Daniel's medical issues.  Mr. Sharp submitted letters from the following individuals:  Jennifer Jones ("Jones"), the nurse who completed the NTA submitted to ODODD; Kristen Kenney ("Kenney"), one of three physicians treating Daniel; Rebecca Morrison ("Morrison"), a PhD who has worked with Daniel since 2003; Sarah Milby ("Milby"), RN; and Amy Caywood ("Caywood"), RN at the clinic where Daniel goes for his diabetes.

{¶10}  Jones is the nurse who completed the NTA for Daniel that Patterson based her testimony upon.  Jones stated in her letter that she gathered information from: Daniel's doctor's orders, a review of nurses' notes, a review of Daniel's psychoeducational assessment, her interview with Daniel's nurse, and her conversation with Daniel's service and support administrator.  Jones stated Daniel's insulin regulation is not just a simple task of following physician's orders and giving an exact does of insulin; rather, there is assessment that must go into the decision before the insulin is given and this assessment comes from a nurse who can use his or her assessment skills and respond accordingly with medical knowledge.  If Daniel's blood sugar goes too high, it can cause a life-threatening state called diabetic ketoacidosis and if his blood sugar drops too low, it can immediately be life threatening by leading to seizure and loss of consciousness.

{¶11}  Jones believes actually giving Daniel the insulin is the easy part, but what is not easy in Daniel's case is the assessment portion of the insulin administration, considering there are several factors involved each time an insulin injection is given,

including the pump site location, Daniel's activity level, and his food intake. Each of these factors affects whether the insulin dose needs adjusted. Jones considers Daniel's case to be a complex one with his diabetes and autism, as Daniel is not able to tell someone he is not feeling well, so the nurse must be diligent in her assessment skills to identify if Daniel is having low blood sugar or high blood sugar so as to provide immediate treatment to bring his blood sugar back to normal. Jones stated that no day is ever the same for Daniel because there are daily insulin adjustments, meaning the nurse overrides the amount of insulin the pump indicates be given to give more or less insulin.

{¶12} Jones teaches classes to unlicensed personnel so they can, with nursing delegation, administer insulin. Jones believes there are times when it is safe to have certified staff care for and administer insulin; however there are circumstances in which it is unsafe to do so when there is a lot of daily changes of insulin dosing and assessment required for such dosing, and each individual circumstance is different. Jones does not think Daniel's case is one where it is safe for a non-nurse to administer insulin because with every blood sugar check, there is decision-making, as documented in the nurse's notes, where the nurse gave more or less insulin than indicated by the pump to avert low blood sugar. Jones does not believe this type of decision-making is within the scope of practice for certified staff, as they are not allowed to make any decisions based on assessment, and they are not allowed to override the dose of insulin the pump identifies be given to Daniel.

{¶13} Jones concluded it is her opinion that Daniel is not one of the cases in which it is advantageous for him to have a non-nurse tend to his blood sugar needs throughout

the day due to his frequent fluctuations and need for constant adjustments and he should continue with the nursing care he currently has in place.

{¶14} In her letter, Morrison stated she has worked with Daniel since 2003 at Oakstone Academy and that Daniel has an extremely low IQ and an inability to articulate his internal feelings and perceptions, as he is unable to assist verbally or physically in his daily medical care. Morrison believes that in Daniel's case, delegated nursing could be deadly because multiple symptoms mirror each other among his diagnoses. Morrison stated Daniel, "requires frequent medical interventions to stabilize blood sugar that in my opinion requires skilled nursing" and "ongoing nursing care is the only reason he remains medically stable."

{¶15} Kenney described Daniel's three medical conditions as serious and, in combination, "create a high level of difficulty and complexity managing his day-to-day treatment and require skilled nursing care." Because of his Type 1 diabetes, Daniel experiences "frequent and wide" fluctuations of glucose levels requiring continuous monitoring by manual glucose checks every two hours. While the pump is programmed for typical blood glucose levels, the nurse determines the insulin dosing throughout the day based on the glucose readings, amount of food consumed, activity levels, and any alarms triggered by the pump. Kenney stated these adjustments of insulin that occur throughout the day are in "real time" and require the individual judgment of a nurse for appropriate dosing. Kennedy opined the, "presence of all three conditions, combined with Daniel's limited communication and reasoning abilities, create a medical complexity that requires a high level of nursing care, expertise, and independent decision-making each day and the skill level required for Daniel's care is greater than that of the typical caregiver

due to the need to make independent judgment for appropriate treatment and medical dosing throughout the day and the need to give injections as needed."

{¶16} Milby's letter stated that, because of Daniel's seizure and diabetic history, a skilled nurse assesses and acts on acute changes to promote the best possible outcome for Daniel. Caywood's letter provided that Daniel experiences frequent fluctuations in his blood sugar readings and is not able to verbalize how he is feeling or symptoms of high or low glucose, so it is important to have a nurse who is able to assess his non-verbal cues.

{¶17} The hearing officer left the record of the hearing open until April 6, 2018 to allow ODODD to review the additional evidence provided by appellant during the hearing. ODODD did not add any rebuttal to this evidence.

{¶18} The hearing officer issued a decision on May 1, 2018 overruling appellant's appeal, finding that though appellant requires assistance with all aspects of care, this assistance does not need to be provided by licensed nurses. On July 6, 2018, the case was remanded to the hearing officer by ODJFS to issue a supplemental decision that includes addressing appellant's evidence accepted at the hearing. The hearing officer issued a supplemental decision on July 30, 2018, finding the additional evidence did not show how the private duty nursing services meet the generally accepted standards of medical practice or that private duty nursing services are clinically appropriate in this case. The hearing officer characterized the letters by Morrison and Jones as indicating Daniel would benefit from continued private duty nursing services, but that there was no evidence to indicate the services were medically necessary and could not be performed

by trained and certified HPC providers. The hearing officer again denied appellant's appeal.

{¶19} Appellant appealed the decision of the hearing officer to ODJFS, which conducts state administrative reviews of Medicaid waiver denials.

{¶20} On September 14, 2018, ODJFS affirmed the decision of the hearing officer. The decision states, in pertinent part: an HPC with proper certification and nursing delegation is more than capable of following the physician's order and seek further orders as necessary; the lowest cost requirement of medical necessity is not met with PDN because HPC services are 35% less expensive than PDN; since a properly certified HPC with nursing delegation can meet Daniel's needs and costs less than PDN, PDN is not medically necessary; ODODD was not responsible for the NTA and 485 plan; even taking into account the updated 485 plan, HPC services are appropriate; the letters submitted by appellant do not mean PDN is medically necessary; and there is nothing to provide a specific basis for requiring PDN over HPC.

{¶21} On October 18, 2018, appellant appealed the decision of ODJFS to the Licking County Court of Common Pleas. Appellant filed a brief on February 15, 2019. Appellee filed a brief on March 15, 2019. Appellant filed a reply brief on March 29, 2019.

{¶22} The trial court issued a judgment entry on May 29, 2019. As to appellant's argument that ODJFS misconstrued the statutory and administrative code provisions that regulate the delegation of nursing skills and tasks, the trial court found ODJFS was not in error in finding the monitoring of the insulin delegable because it is routine. The trial court reasoned, "while the dose varies, Mr. Sharp is routinely, as appellant defines the term 'routine' in her brief, monitored and given insulin or food." The trial court stated the

administrative rules for delegating the administration of insulin are not inconsistent with the requirement in R.C. 5123.42(C) that the doses be routine because the nurse delegating the task is accountable for any decision to delegate the task. As to the balance of appellant's assignments of error, the trial court found the decision of ODJFS was supported by reliable, probative, and substantial evidence, namely the NTA and 485 plan of care.

{¶23} Appellant appeals the May 29, 2019 judgment entry of the Licking County Court of Common Pleas and assigns the following as error:

{¶24} "I. THE TRIAL COURT MISCONSTRUED THE OHIO STATUTES AND ADMINISTRATIVE CODE PROVISIONS THAT REGULATE THE DELEGATION OF NURSING SKILLS AND TASKS.

{¶25} "II. THE TRIAL COURT ERRED IN FINDING THAT THE ADMINISTRATIVE DECISION WAS SUPPORTED BY RELIABLE, PROBATIVE, AND SUBSTANTIAL EVIDENCE.

{¶26} "III. THE TRIAL COURT ERRED WHEN IT FAILED TO OVERRULE THE ADMINISTRATIVE DECISION FOR FAILING TO MEET ITS BURDEN OF PROOF.

{¶27} "IV. THE TRIAL COURT ERRED WHEN IT FOUND THAT DANIEL HAD NOT BEEN DENIED DUE PROCESS AND THE EQUAL PROTECTION OF THE LAW."

*Standard of Review*

{¶28} The common pleas court's "review of the administrative record is neither a trial de novo nor an appeal on questions of law only, but a hybrid review in which the court 'must apprise all the evidence as to the credibility of the witnesses, the probative character of the evidence, and the weight thereof.'" *Andrews v. Bd. of Liquor Control*, 164 Ohio St.

275, 131 N.E.2d 390 (1955). The trial court reviews an order to determine whether it is supported by a preponderance of reliable, probative, and substantial evidence and is in accordance with the law. *Our Place, Inc. v. Ohio Liquor Control Comm.*, 63 Ohio St.3d 570, 589 N.E.2d 1303 (1992). Reliable evidence is "dependable; that is, it can be confidently trusted. In order to be reliable, there must be a reasonable probability that the evidence is true." *Id.* Probative evidence "is evidence that tends to prove the issue in question; it must be relevant in determining the issue." *Id.* Substantial evidence "is evidence with some weight; it must have importance and value." *Id.*

{¶29} Due deference must be given to the administrative resolution of conflicting testimony. *Crumpler v. State Bd. of Edn.*, 71 Ohio App.3d 526, 594 N.E.2d 1071 (10th Dist. 1991). On questions of law, the common pleas court conducts a de novo review in determining whether the administrative order is "in accordance with law." *Ohio Historical Soc. v. State Emp. Relations Bd.*, 66 Ohio St.3d 466, 613 N.E.2d 591 (1993).

{¶30} On appeal to this Court, the standard of review is more limited. Unlike the court of common pleas, a court of appeals does not determine the weight of the evidence. *Rossford Exempted Village School Dist. Bd. of Edn. v. State Bd. of Edn.*, 63 Ohio St.3d 705, 590 N.E.2d 1240 (1992). In reviewing the court of common pleas' determination that the administrative order was supported by a preponderance of reliable, probative, and substantial evidence, this Court's role is limited to determining whether the court of common pleas abused its discretion. *Roy v. Ohio State Med. Bd.*, 80 Ohio App.3d 675, 610 N.E.2d 562 (10th Dist. 1992). Absent an abuse of discretion on the part of the trial court, a court of appeals cannot substitute its judgment for that of the administrative body or the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 614 N.E.2d 748 (1993).

However, on the question of whether the administrative order was in accordance with the law, this Court's review is plenary. *Univ. Hosp., Univ. of Cincinnati College of Medicine v. State Emp. Relations Bd.*, 63 Ohio St.3d 339, 587 N.E.2d 835 (1992); *Montgomery v. Ohio Dept. of Job and Family Serv.,* 5th Dist. Delaware No. 11 CAH 06 0054, 2012-Ohio-574.

I.

{¶31}   In her first assignment of error, appellant argues the trial court misconstrued Ohio statutes and administrative code provisions that regulate the delegation of nursing skills and tasks and thus the administrative order was not in accordance with the law.  We agree.

{¶32}   The trial court, in adopting the argument of appellee, found that while Daniel's insulin dose varies, Daniel is "routinely" monitored and the nurse delegating the task is accountable for any decision to delegate; thus, delegation in this case is permissible pursuant to R.C. 5123.42.  Appellee contends that while the dose of insulin is not necessarily constant, the administration of insulin to Daniel is routine because the doses are habitual and not emergency doses.

{¶33}   R.C. 5123.42 permits developmental disabilities personnel who are not specifically authorized by other provisions of the Revised Code to administer medications or perform health-related activities to individuals with developmental disabilities under specific conditions.  Specifically, at issue in this case, is R.C. 5123.42(C)(1)(e), which provides that "with nursing delegation, developmental disabilities personnel may administer routine doses of insulin through subcutaneous injections, inhalation, and insulin pumps."

{¶34} Appellee argues the term "routine" contained in R.C. 5123.42(C)(1)(e) is the same as the term "prescribed" in Ohio Adm. Code 5123:2-6-03. We disagree. Ohio Adm. Code 5123:2-6-03 provides that, with nursing delegation, developmental disabilities personnel may "administer prescribed insulin through subcutaneous injection, inhalation, and insulin pump." The General Assembly utilizes both the term "routine" and the term "prescribed" in R.C. 5123.42. The statute states the administration of "routine" doses of insulin through insulin pumps may be delegated. The statute also states the following may be delegated: the administration of "oral and topical prescribed medications," the administration of "prescribed medications through gastrostomy and jejunostomy tubes, if the tubes being used are stable and labeled," and administration of "prescribed medications for the treatment of metabolic glycemic disorders through subcutaneous injections." It is evident from the plain language of the statute that the two terms are not used interchangeably. Appellee contends the term "prescribed" is the same as the term "routine" in the sense that both deal with non-emergency doses. However, "routine" is not defined in R.C. 5123.42 and "prescribed medication," as defined in the Ohio Administrative Code, is not limited to routine doses. Ohio Adm. Code 5123:2-6-01(HH) (defining "prescribed medication" as a drug administered according to the instructions of a licensed health professional").

{¶35} Additionally, other Administrative Code provisions use the word "routine" with regards to delegable insulin tasks, demonstrating that the terms "prescribed" and "routine" are not interchangeable. The section of the Ohio Administrative Code pertaining to private duty nursing requirements and coverage provides that "nursing tasks and activities that shall only be performed by an RN include, but are not limited to, * * * (3)

programming of a pump to deliver medications including, but not limited to, epidural, subcutaneous, and IV (except routine doses of insulin through a programmed pump)." Ohio Adm. Code 5160-12-02(C)(3).

{¶36} Further, Ohio Adm. Code 5123:2-6-03(A) specifically references R.C. 5123.42, stating, "[d]evelopmental disabilities personnel who are not specifically authorized by other provisions of the Revised Code to perform health-related activities or administer prescribed medication may do so pursuant to R.C. 5123.42 of the Revised Code * * *."  Thus, it is clear the provisions of R.C. 5123.42 must be met in order for delegation to occur.

{¶37} To the extent that the rule and statute conflict with regard to the terms "routine" and "prescribed," the statute prevails and thus ODJFS' interpretation of the word "routine" is not entitled to deference.  *Williams v. Spitzer Autoworld Canton, LLC*, 122 Ohio St.3d 546, 2009-Ohio-3554, 913 N.E.2d 410; *Lang v. Dir., Ohio Dept. of Job and Family Services*, 134 Ohio St.3d 296, 2012-Ohio-5366, 982 N.E.2d 636; *In re: Avon Skilled Nursing and Rehabilitation*, 10th Dist. Franklin No. 18AP-863, 2019-Ohio-3790 (due deference to an agency's interpretation of the rules may be disregarded when judicial construction makes it imperative to do so).

{¶38} R.C. 5123.42 does not define the term "routine."  Words in a statute must be given their common, plain, and ordinary meaning unless contrary intention clearly appears or is otherwise indicated.  *Rice v. Village of Johnstown Planning & Zoning Commission*, 5th Dist. Licking No. 19-CA-18, 2019-Ohio-4037.  Merriam-Webster defines "routine" as, "a regular course of procedure," or "of a commonplace or repetitious character." *Merriam-Webster's Collegiate Dictionary*, 11th Ed. (2009).

{¶39} While appellee and the trial court focus on the fact that the monitoring of Daniel is routine and the fact that Daniel continually needs some dose of insulin routinely, the plain language contained in the statute specifically states that the dose must be routine. Upon our plenary review, we find the testimony and evidence demonstrate ODJFS' order is not in accordance with R.C. 5123.42 and thus is not in accordance with the law. The only evidence in this case demonstrates Daniel's dose of insulin is not a regular course of procedure or of a commonplace or repetitious character, due to the complexity of his medical conditions.

{¶40} Patterson testified that the insulin order in the plan of care states 100 units per milliliter, pump solution, however, Daniel's blood sugar is checked every two hours and, based upon this level and Daniel's carbohydrates, "there were modifications made to the insulin pump dosage." Doug Sharp testified there is no sliding scale included in the physician's orders with regards to insulin because the decisions are made in real-time, based upon Daniel's blood sugar, his activity level, and the physical symptoms seen by the nurse at the time. Jones stated Daniel's insulin regulation is not a simple task of following physician's orders and giving an exact dose of insulin; rather, a nurse must do an assessment prior to giving the insulin dose and factors such as Daniel's activity level, food intake, and pump location affects the insulin dose. Jones stated that no day is ever the same for Daniel because there are daily insulin adjustments, meaning the nurse overrides the pump and gives more or less than is indicated by the pump. Kenney stated that while the pump is programmed for typical blood glucose levels, the nurse determines the amount of insulin dosing throughout the day based on the glucose readings, amount of food consumed, activity levels, and alarms triggered by the pump. Kenney described

these adjustments of insulin dosing as occurring in "real time" and stated they require the individual judgment of a nurse for appropriate dosing. The nursing notes in the NTA demonstrate the units given to Daniel vary during each day, vary from day to day, and show that the same fingerstick blood sugar level does not necessarily require the same dose of insulin each time. The fact that the delegating nurse has the final say on whether a dose can be administered does not make a non-routine dose of insulin a delegable task under R.C. 5123.42.

{¶41} Appellant's first assignment of error is sustained.

## II. & III.

{¶42} In her second and third assignments of error, appellant make essentially the same argument, that the trial court abused its discretion in finding the administrative decision was supported by a preponderance of the reliable, probative, and substantial evidence. We agree with appellant. As this Court has previously stated, a determination that an agency decision is supported by reliable, probative, and substantial evidence does not meet the standard; rather, the decision must be supported by a preponderance of such evidence. *Okey v. City of Alliance Planning Comm.*, 5th Dist. Stark No. 2018 CA 00144, 2019-Ohio-2390.

{¶43} Pursuant to the analysis in our first assignment of error, we find the trial court abused its discretion in finding the preponderance of the reliable, probative, and substantial evidence demonstrated that Daniel's insulin doses are routine. Appellee has the burden to establish, by a preponderance of the evidence, that Daniel's insulin dose is routine in order to establish that Daniel's insulin administration can be done by a certified HPC provider with nurse delegation. Ohio Adm. Code 5101:6-7-01(C)(1)(c). All of the

evidence presented, including the testimony of Patterson, demonstrates that Daniel's insulin dose varies each day and varies from day to day.

{¶44} Appellee focuses much of its argument on the issue of "medical necessity" and argues that ODJFS' determination that PDN is not "clinically appropriate in its type, frequency, extent, duration, and delivery setting" and is not "the lowest cost alternative that effectively addresses and treats the medical problem" is supported by reliable, probative, and substantial evidence.

{¶45} We first note that there is no evidence in the record that PDN is not the lowest cost alternative to ensure the health and welfare of Daniel, as stated in Ohio Adm. Code 5123-2-39(D)(3)(c). Counsel for appellee at the administrative hearing stated that "HPC providers generally cost about 35 percent less than licensed nursing." However, there is no evidence about the cost of PDN versus the cost of a certified HPC provider as it applies to Daniel and no evidence of the cost of the HPC provider with the certifications required to administer insulin to Daniel. The statement by counsel is not reliable, probative, or substantial evidence on the issue of whether certified HPC service with nurse delegation is the lowest cost alternative to ensure the health and welfare of Daniel.

{¶46} Both the hearing officer and ODJFS found there was no specific evidence that PDN was medically necessary for Daniel. However, both the hearing officer and ODJFS discounted the evidence appellant presented regarding medical necessity, classifying it as physician recommendations.

{¶47} The only evidence presented by appellee as to why PDN is now not clinically appropriate to meet Daniel's health and welfare needs and/or is not appropriate in "type, amount, duration, scope, and intensity" is the testimony of Patterson that the

NTA and 485 plan of care demonstrate that PDN is not medically necessary. However, the plan of care calls for skilled nursing, as does the nurse who completed the NTA (Jones).

{¶48} Both the hearing officer and ODJFS found the evidence provided by appellant with regards to medical necessity, such as the physician's orders in the 485 plan for skilled nursing five days a week, 9.9 hours per day, Kenney's opinion that Daniel's three medical conditions, "combined with Daniel's limited communication and reasoning abilities, create a medical complexity that requires a high level of nursing care, expertise, and independent decision-making each day and the skill level required for Daniel's care is greater than that of the typical caregiver due to the need to make independent judgment for appropriate treatment," and Jones' statement that Daniel's care requires constant assessment that is not within the scope of certified HPC providers, was not dispositive of the issue of medical necessity because the Ohio Administrative Code states, "the fact that a physician * * * renders, prescribes, orders, certifies, recommends, approves, or submits a claim for * * * service does not, in and of itself, make the * * * service medically necessary and does not guarantee payment for it." Ohio Adm. Code 5160-1-01(D).

{¶49} We recognize that due deference must be given to the hearing officer and ODJFS' administrative resolution of conflicting testimony. However, in this case, both the hearing officer and ODJFS' found that appellant did not present any specific evidence of medical necessity, yet simultaneously discounted the specific evidence of medical necessity presented by appellant as "physician recommendations."

{¶50} Based upon the totality of the evidence, we find the trial court abused its discretion in finding the agency decision was supported by a preponderance of the

reliable, probative, and substantial evidence.  Appellant's second and third assignments of error are sustained.

IV.

{¶51}  In her fourth assignment of error, appellant contends the trial court abused its discretion when it found Daniel had not been denied Due Process and Equal Protection of the Law. However, appellant does not identify a specific equal protection violation in this case.  Further, as to appellant's due process argument, due process requires a government agency to provide an individual with reasonable notice and a meaningful opportunity to be heard before a final administrative decision.  *Ohio Assn. of Public School Emp. v. Lakewood City School Dist. Bd. of Edn.*, 68 Ohio St.3d 175, 624 N.E.2d 1043 (1994).  In this case, appellant was provided with reasonable notice and a meaningful opportunity to be heard before the state hearing officer and ODJFS issued their decisions. Accordingly, appellant's fourth assignment of error is overruled.

{¶52}  Based on the foregoing, appellant's first, second, and third assignments of error are sustained.

{¶53} The May 29, 2019 judgment entry of the Licking County Court of Common Pleas is reversed and we reverse and vacate the decision and order by ODJFS.

By Gwin, P.J.,

Baldwin, J., and

Wise, Earle, J., concur