[Cite as *Henneforth v. Seidt*, 2025-Ohio-1109.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | JUDGES: |
|---|---|---|
| CHRISTOPHER J. HENNEFORTH | : | Hon. William B. Hoffman, P.J. |
| | : | Hon. Craig R. Baldwin, J. |
| Plaintiff-Appellant | : | Hon. Kevin W. Popham, J. |
| | : | |
| -vs- | : | |
| | : | Case No. 24 CAE 06 0040 |
| ANDREA L. SEIDT, | : | |
| COMMISSIONER, OHIO | : | |
| DEPARTMENT OF COMMERCE, | : | OPINION |
| DIVISION OF SECURTIES | | |
| | | |
| Defendant-Appellee | | |


CHARACTER OF PROCEEDING:        Appeal from the Delaware County Court of
                                Common Pleas, Case No. 2023 CVF 12
                                0974


JUDGMENT:                       Affirmed



DATE OF JUDGMENT ENTRY:         March 28, 2025



APPEARANCES:

For Plaintiff-Appellant                 For Defendant-Appellee

MATTHEW L. JALANDONI                    DAVID YOST
Flannery Georgalis, LLC                 Attorney General
175 S. 3rd St., Ste. 1060               BY: CHAD M. KOHLER
Columbus, OH 43215                      Assistant Attorney General
                                        30 E. Broad St. 26th Floor
                                        Columbus, OH 43215

*Popham, J.,*

**{¶1}** Appellant appeals the May 28, 2024, judgment entry of the Delaware County Court of Common Pleas.

*Facts & Procedural History*

**{¶2}** Appellant Christopher Henneforth worked as a licensed investment advisor and was the president/owner of Level Partners Management, Inc. ("Level"). Appellant currently serves as the CFO of two other companies, Omnia Medical, LLC, and Exacter, Inc.

**{¶3}** In March of 2015, Robert Walton was the President and CEO of Hadsell Chemical Processing, LLP ("HCP"). Appellant recruited investors for HCP and managed the funds received from the investors. Specifically at issue in this case are two investors named C.B. and B.S. From March 2, 2015, to September 21, 2015, appellant encouraged his clients from Level to invest in HCP. In return for their investments, HCP issued the investors promissory notes, which were not registered securities under Ohio law. The promissory notes were purportedly guaranteed by Don Hadsell, the minority owner of HCP. The promissory notes stated the funds were to be used for HCP's "commercial, agricultural, or industrial activities."

**{¶4}** In exchange for recruiting investors, and pursuant to a contract he had with HCP, appellant received a commission for the investments he solicited. He also received a salary from HCP. Appellant did not disclose his employment with HCP to investors. He also verbally informed investors the funds they invested would be used by HCP to acquire tools and equipment.

**{¶5}** In April of 2015, appellant opened a Chase Platinum Business Checking Account at JPMorgan Chase Bank ("Chase") in the name of HCP. Appellant was the sole authorized signatory on the account, and account statements were mailed to appellant's personal residence, which was identified by appellant as HCP's business address.

**{¶6}** After a tip from Don Hadsell that he had not actually signed the promissory notes, the Securities and Exchange Commission began an investigation. It was discovered that Walton had falsified HCP's business records, forged the personal guarantees on the promissory notes, and made HCP appear operational, which it was not. None of the investments actually funded HCP's business operations. Rather, appellant used the funds he solicited to pay wages, commissions, and travel expenses to himself, advisory fees to Level, and interest payments to other, earlier investors, including appellant himself. HCP eventually filed bankruptcy. The investors appellant solicited were never repaid.

**{¶7}** Walton pled guilty to criminal wire fraud, theft, embezzlement, and conversion. The SEC investigation resulted in a consent order with Walton and HCP, enjoining further violations of federal securities laws, ordering disgorgement of funds, and imposing a civil monetary penalty.

**{¶8}** On April 29, 2020, the Ohio Department of Commerce, Division of Securities ("Division") issued to appellant a "Notice of Intent to Suspend or Revoke [his] Investment Advisor Representative License" ("Notice"). The Notice was 127-paragraphs long and detailed the factual allegations for each count and the Revised Code or Administrative Code section allegedly violated in each count.

{¶9} Prior to the hearing, appellant issued subpoenas to the Division, seeking *Brady* materials (exculpatory or impeachment evidence) in the Division's possession, including any impeachment or exculpatory evidence the Division obtained in their interviews with C.B. and B.S. during its investigation. Upon a motion from the Division, the Hearing Officer quashed the subpoena, finding *Brady* did not apply in this civil case.

{¶10} The Hearing Officer conducted a hearing on April 11th and 12th of 2023. Testimony was taken from the following individuals at the hearing: Janice Hitzeman, Attorney Inspector with the Division, C.B., B.S., Anne Fellowell, Licensing Chief with the Division, Timothy Rist, and appellant.

{¶11} Hitzeman testified extensively to the investigation of appellant. She reviewed the specifics of the promissory notes. She then reviewed, in detail, the emails and bank records of appellant, testifying how the evidence shows that: between April 27, 2015 and September 2015, a total of $1,043,957.86 came into the Chase account of which appellant was the sole signatory, including $925,000 of investor funds ($650,000 from appellant and Level's investment advisory clients); only $195,000 was transferred to HCP; from the Chase funds, appellant was paid $30,000 as his salary from HCP and $77,500 as commissions from HCP; $24,093.75 was paid to Level for investment advisory fees; $108,824.60 was paid to appellant as interest and principal repayments on loans he made to HCP; $4,203.72 was paid to appellant as expense reimbursements; and $583,643.93 was used to pay interest payments to previous investors of HCP.

{¶12} Hitzeman also testified to the investments of both C.B. and B.S. In regards to B.S., the records she obtained demonstrated: B.S. initially invested $100,000 with appellant for HCP and received a promissory note; B.S. invested an additional $200,000

and received an additional promissory note; prior to the deposit of B.S.'s $200,000, the Chase account had a balance of zero; after B.S.'s deposit, $8,437.50 was transferred from the Chase account to Level for advisory fees; $6,000 was transferred to appellant for his April salary; $77,500 was transferred to appellant for commissions; $96,242,51 was paid from the Chase account to prior investors; none of the funds B.S. deposited into the Chase account were used for commercial, agricultural, or industrial activities or used to purchase equipment or machines for HCP; and HCP has not paid off the principal of either of the promissory notes with B.S.

{¶13} As to C.B., the records demonstrated: in June of 2015, C.B. agreed to invest $250,000 with appellant for HCP and received a promissory note; C.B. gave appellant a check for $125,000 in July; prior to the deposit of these funds, the Chase account had a balance of $549.79; none of the funds were transferred to HCP; $112,526.94 was paid to prior investors as interest payments; $4,302.72 was transferred to appellant to reimburse him for a trip to Colorado with investors; $6,000 was transferred to appellant for his July salary; $2,000 was transferred to appellant as a loan repayment; C.B. gave appellant the remaining $125,000 in August of 2015; none of these funds were transferred to HCP; these funds were again used to pay prior investors, appellant, or Level; and HCP has not paid C.B. the principal or interest on the promissory note.

{¶14} When asked on cross-examination what false statements appellant made that served as the basis for a R.C. 1707.44(B)(4) violation, Hitzeman stated there were two types of affirmative representations: (1) the affirmative representations contained in the promissory notes appellant delivered to C.B. and B.S. and (2) the affirmative

representations appellant made directly (verbally) to both C.B. and B.S. concerning how the proceeds from their investments would be used.

{¶15} C.B. testified that appellant had been his financial advisor since 2008. Appellant brought the HCP investment opportunity to C.B. in 2015. Based upon their discussions and what appellant told him, C.B. thought his funds were going to be used for "various machinery that was going to be used to do different projects." Appellant told C.B. he was seeking investors for HCP to "get new equipment." Appellant did not disclose to C.B. that appellant had an ownership interest in HCP; that he was being paid a salary by HCP; that HCP was paying him commission; or that he was the CFO of HCP.

{¶16} On cross-examination, C.B. stated he did not question what appellant told him about the use of the funds because appellant told him what they were going to be used for, and HCP was "going to be buying certain things for this company so they could do certain projects that they had secured, but they didn't have the equipment yet for them." C.B. confirmed he did not remember every specific conversation he had with appellant related to this investment.

{¶17} B.S. knew appellant for several years when appellant brought HCP to his attention. B.S. remembered appellant describing HCP to him and telling him that while he would never say it was a "sure thing" in investing, this was as close as appellant would find for B.S. because Don Hadsell was going to personally sign and guarantee the promissory notes. Based upon his conversations with appellant, B.S. thought his funds would be used for "working capital" because HCP "had, I think, a backlog of orders and their line needed updates, so equipment and that type of thing." Appellant did not disclose to B.S. that appellant had an ownership interest in HCP; that he was being paid a salary

by HCP; that HCP was paying him commission; or that he was the CFO of HCP. On cross-examination, B.S. stated he did not remember verbatim the exact words of his conversations with appellant. While B.S. did not remember the exact words, he "remembered the meaning."

{¶18} Fellowell, the Licensing Chief from the Division, testified primarily to the "licensing" components of the violations, i.e., the filings or disclosures licensed investment advisors are required to submit to the Division on a regular basis and records requirements the Division must check at the advisor's place of business.

{¶19} Rist testified he worked as the head accountant for HCP. He prepared the financial statements for HCP. Rist stated he had access to the bank accounts of HCP. When asked whether HCP had one bank account or more than one account, Rist could not remember. Rist does not know appellant, and does not remember appellant's name being on any documents related to HCP. Rist was not aware that appellant had access to accounts of HCP and was not aware if appellant was an officer of HCP.

{¶20} On cross-examination, Rist stated he did not have check-signing authority on any bank accounts for HCP. He could only log into the account to manage the day-to-day payment of bills. Rist did not remember a Chase account. He never saw a bank statement from a Chase account and was not aware of any of the transactions in the Chase account, but remembers people talking about a Chase account throughout the investigation.

{¶21} Appellant testified he is a victim of Walton's deception, and he believed the investments were legitimately funding HCP's business operations. Appellant also stated he was unaware how the investment funds were being used, even though he controlled

the bank account in which those funds were deposited and from which appellant paid himself and others.

{¶22} Appellant testified that, despite his contract with HCP saying he was the CFO for HCP, he was not actually the CFO because Walton "redirected his responsibilities." When asked what he specifically told his investors about his role with HCP, appellant stated he didn't "have specific knowledge of what [he] did or didn't say," but that with C.B. and B.S., it was very common for them to insist appellant be involved with the company because they relied on his business acumen. Appellant stated he did not remember specifically telling either C.B. or B.S. what their funds would be used for, but he likely told them "working capital," because that is what he believed the funds were used for. Appellant believes the phrase "working capital" would include paying interest to previous investors of HCP and paying employees. Appellant also believed paying prior investors, paying advisory fees, and paying his salary was "commercial activity." However, at his initial hearing with the Division several years prior, appellant testified none of the investors' funds were used for "commercial activity."

{¶23} The Hearing Officer issued a Report and Recommendation ("Report") revoking appellant's investment advisor representative license and ordering appellant to cease and desist from any acts and practices in violation of Revised Code Chapter 1707. The Hearing Officer found appellant was afforded full procedural due-process rights, including proper notification of the proposed action. Further, the Hearing Officer concluded appellant violated: R.C. 1707.44(A)(1) (selling promissory notes in the reasonable expectation of receiving a fee or commission); R.C. 1707.14(A) (selling promissory notes without being properly licensed as a dealer); R.C. 1707.44(B)(4)

(informing clients and potential investors proceeds of their investments in HCP would be used for purposes they were not used for); R.C. 1707.44(C)(1) (selling unregistered securities); R.C. 1707.44(G) (selling securities while not properly making disclosures to B.S. and C.B.); R.C. 1707.44(M)(1)(d) (misrepresenting to investors the intended use of investment proceeds and failing to make disclosures); R.C. 1707.44(M)(2) (failing to follow administrative code when depositing funds in Chase account); Adm.Code 1301:6-3-44(E)(1)(f) (advising clients to invest in HCP without adequate disclosures) and Admin.Code 1301-6-3-16.1(C) (failing to update forms). The Hearing Officer also concluded appellant's license was subject to suspension or revocation under R.C. 1707.19(A)(4) and R.C. 1707.19(A)(9) and that appellant is not of "good business repute" based upon the factors contained in the Ohio Administrative Code.

{¶24} Appellant appealed the Report to the Division. The Division issued Administrative Order No. 23-044 ("Order") on December 1, 2023. The Division found there was reliable, probative, and substantial evidence to support the charges and to support the majority of the Hearing Officer's findings of fact and conclusions of law.

{¶25} The Division disapproved, in whole or in part, of three of the Hearing Officer's findings of fact: (1) appellant was an officer of HCP when he sold HCP securities to investors; (2) appellant did not disclose his financial interest in HCP to C.B.; and (3) appellant failed to disclose to B.S. the promissory notes were unregistered. However, the Division determined these findings were only a partial basis for the charges under R.C. 1707.44(G) and (M)(1)(d), and the other violations under these sections were each capable of independently substantiating a violation. Thus, the Division did not overturn any of the Hearing Officer's conclusions of law.

{¶26} The Division also clarified the findings contained in the analysis of the R.C. 1707.44(B)(4) violation, stating appellant "affirmatively misrepresented the use of investor proceeds by verbally assuring them that their money would be used as 'working capital' to buy tools and equipment and by presenting promissory notes stating their money would only be used for commercial, agricultural, or industrial activities." The Division specifically found appellant's assertions that the payments he made to himself and to prior investors was "commercial activity" not credible.

{¶27} The Order adopted the Hearing Officer's Report and Recommendation and issued an order calling for appellant to cease and desist, as well as an order revoking his Ohio investment advisor representative license.

{¶28} Appellant appealed the Order to the Delaware County Court of Common Pleas, and argued eight assignments of error. The trial court issued a detailed and comprehensive judgment entry on May 28, 2024, overruling appellant's assignments of error, and finding the Order was supported by reliable, probative, and substantial evidence, and was in accordance with law.

{¶29} Appellant appeals the May 28, 2024, judgment entry of the Delaware County Court of Common Pleas and assigns the following as error:

{¶30} "I. THE DIVISION OF SECURITIES VIOLATED MR. HENNEFORTH'S CONSTITUTIONAL AND STATUTORY DUE PROCESS RIGHTS BY IMPROPERLY WITHHOLDING EVIDENCE, LIMITING HIS ABILITY TO CROSS-EXAMINE ITS WITNESSES, AND FAILING TO PROVIDE ADEQUATE NOTICE OF THE BASIS FOR ITS MOST SERIOUS CHARGE.

**{¶31}** "II. THE DIVISION'S FINDING THAT HENNEFORTH SOLD NONEXEMPT UNREGISTERED SECURITIES IS CONTRARY TO THE PLAIN TEXT OF THE RELEVANT STATUTE, WHICH REQUIRES THE SALE TO BE PUBLIC FOR THE EXEMPTION NOT TO APPLY.

**{¶32}** "III. THE DIVISION FAILED TO PROVE UNDER THE PROPER LEGAL STANDARD THAT MR. HENNEFORTH KNOWINGLY MADE OR CAUSED TO BE MADE ANY AFFIRMATIVE MISSTATEMENT OF MATERIAL INFORMATION UNDER R.C. 1707.44(B)(4)."

*Standard of Review*

**{¶33}** R.C. 119.12(N) sets forth the standard of review employed by the trial court. It provides the court may affirm the Order if, "upon consideration of the entire record and any additional evidence the court has admitted, the order is supported by reliable, probative, and substantial evidence, and is in accordance with law."

**{¶34}** As explained by the Supreme Court of Ohio, the trial court conducts two inquiries: a hybrid factual/legal inquiry and a purely legal inquiry. *Bartchy v. State Bd. of Edn.*, 2008-Ohio-4826. In the first inquiry, "[a]n agency's findings of fact are presumed to be correct and must be deferred to by a reviewing court unless that court determines that the agency's findings are internally inconsistent, impeached by evidence of a prior inconsistent statement, rest upon improper inferences, or are otherwise unsupportable." *Id.* at ¶ 37. In the second inquiry (purely legal), the trial court must construe the law on its own. *Id.* at ¶ 38.

**{¶35}** This Court's role is more limited, and is set forth in R.C. 119.12(O). When reviewing the decision of the common pleas court as to factual matters, we are to

"determine only if the trial court abused its discretion" in determining whether the administrative decision is supported by reliable, probative, and substantial evidence. *Bartchy* at ¶ 41. While it is incumbent on the trial court to examine and weigh the evidence, this Court does not determine the weight of the evidence. *Id.* "The fact that the court of appeals * * * might have arrived at a different conclusion than did the administrative agency is immaterial. Appellate courts must not substitute their judgment for those of an administrative agency or a trial court absent the approved criteria for doing so." *Lorain City School Dist. Bd. of Edn. v. State Emp. Relations Bd.*, 40 Ohio St.3d 257 (1988). However, on review of purely legal questions, this Court has de novo review. *TWISM Ent., L.L.C. v. State Bd. of Registration for Professional Eng. & Surveyors*, 2022-Ohio-4677, ¶ 42.

I.

{¶36} In his first assignment of error, appellant contends the Division violated his constitutional and statutory due process rights. Appellant lists five specific reasons as to why he believes his due process rights were violated: (1) *Brady* violations, (2) lack of meaningful cross-examination, (3) improperly withholding evidence, (4) failure to provide adequate notice of the basis for its most serious charge, and (5) the refusal to identify the Division's potential witnesses and exhibits until seven days before the hearing.

{¶37} Both the Supreme Court of the United States and the Supreme Court of Ohio have held that the Fourteenth Amendment to the U.S. Constitution and Section 16, Article I of the Ohio Constitution, require that administrative proceedings comport with due process. *Mathews v. Eldridge*, 424 U.S. 319 (1976); *Doyle v. Ohio Bur. of Motor Vehicles*, 51 Ohio St.3d 46 (1990). This Court has stated a party is entitled to procedural

due process in an administrative appeal, which includes reasonable notice and a meaningful opportunity to be heard, in order to ensure the fairness of the hearing. *Quinton v. Delaware Cty. Bd. of Revision*, 2024-Ohio-6034, ¶ 12 (5th Dist.); *Sharp on Behalf of Sharp v. Ohio Dept. of Job & Family Servs.*, 2019-Ohio-5397, ¶ 51 (5th Dist.), citing *Ohio Assn. of Pub. School Emp., AFSCME, AFL-CIO v. Lakewood City School Dist. Bd. of Edn.*, 68 Ohio St.3d 175 (1994).

*Brady Violations*

**{¶38}** Appellant argues his due process rights were violated because the Division withheld exculpatory evidence in violation of the Due Process Clause of the Fourteenth Amendment as articulated in *Brady v. Maryland*, 373 U.S. 83 (1963).

**{¶39}** On March 7, 2023, appellant issued a subpoena to the Division to provide him with "any and all exculpatory or impeachment evidence in the possession of the Division, as those terms are used and understood by *Brady* and its progeny." Specifically, appellant requested segments of transcripts of any investigative interviews of C.B. and B.S. that contained impeachment or exculpatory evidence. The Division moved to quash the subpoena, arguing the documents are statutorily protected from disclosure under R.C. 1707.12(C). The Hearing Officer granted the motion to quash, finding *Brady* is not applicable to this civil proceeding and R.C. 1707.12(C) prevents disclosure. At the hearing, appellant argued he was prevented from obtaining *Brady* materials, specifically, the interviews of Rist, B.S., and C.B., that were conducted during the Division's investigation.

**{¶40}** Courts have uniformly declined to apply *Brady* to civil cases, except in three rare instances: (1) a civil commitment hearing where involuntary confinement occurred

for six months; (2) a civil case where the government's litigation tactics were designed to make the case "virtually impossible to defend"; and (3) a denaturalization and extradition case where the government sought denaturalization and extradition based on alleged criminal activities. *Brodie v. Dept. of Health & Human Servs.*, 951 F.Supp.2d 108, 118 (D.D.C. 2013), citing *U.S. v. Edwards*, 777 F.Supp.2d 985, 994 (E.D.N.C. 2011); *Equal Emp. Opp. Comm. v. Los Alamos Constructors, Inc.*, 382 F.Supp. 1373 (D.N.M. 1974); *Demjanjuk v. Petrovsky*, 10 F.3d 338 (6th Cir. 1993). The rationale for the application of *Brady* in these cases is that the consequences "equal or exceed those of most criminal convictions." *Demjanjuk* at 354.

**{¶41}** Appellant argues this case is like the *Demjanjuk* and *Los Alamos* cases because the consequences are similar to a criminal conviction, specifically, that his license will be revoked and his other companies will have to forego the ability to raise capital. We disagree. While the consequences of the Division's findings against appellant are significant, the consequences in this case do not "equal or exceed those of most criminal convictions." Rather, the consequences appellant faces are the loss of his reputation, the loss of his ability to practice in his chosen profession, and the loss of his ability to earn a livelihood. "These losses are precisely the kind . . . [that do] not warrant applying *Brady*." *Brodie* at 119.

**{¶42}** Many courts have rejected arguments similar to appellant's, finding that *Brady* does not apply in the context of administrative hearings. *Id.* at 119; *Fox ex rel. Fox v. Elk Run Coal Co., Inc.*, 739 F.3d 131 (4th Cir. 2014); *Rivera v. Martin*, 2024 WL 4678913, *10 (S.D.Fla. 2024) (losing custody of child not sufficient consequence for *Brady* to apply); *U.S. v. Project on Gov't Oversight*, 839 F.Supp.2d 330 (D.D.C. 2012)

(*Brady* does not apply when loss of money and reputation are consequences). Further, both the *Los Alamos* and *Demjanjuk* cases have been limited to their unique set of facts. As noted above, many courts since *Los Alamos* have found *Brady* does not apply in the context of administrative hearings. After the *Demjanjuk* case, the Sixth Circuit limited its holding, stating the "seemingly broad language" contained in the *Demjanjuk* case, "must be read in the context of a case that involved an unusual set of circumstances." *In re Extradition of Drayer*, 190 F.3d 410 (6th Cir. 1999).

{¶43} Appellant also argues the proceeding is "quasi-criminal" because he could have been criminally charged under the portions of the Revised Code he was found to have violated. However, as aptly noted by the trial court, appellant has *not* been criminally charged under those statutes and does not face felony punishment as a direct consequence of this administrative proceeding.

{¶44} The facts in this case do not warrant extending *Brady* to apply to this civil proceeding.

*Lack of Meaningful Cross-Examination*

{¶45} Appellant argues he was deprived of a meaningful cross-examination and opportunity to be heard because the Division denied him access to the exculpatory information he requested from the subpoena. As detailed above, the information was not required to be disclosed pursuant to *Brady*. Appellant cites no other rule, statute, or precedent that requires disclosure. In fact, civil procedure rules, including its discovery provisions, do not apply to administrative proceedings. *Bennett v. Ohio Dept. of Edn.*, 2022-Ohio-1747 (4th Dist.); *Ohio Dept. of Alcohol & Drug Addiction Servs. v. Morris*, 2005-Ohio-3053 (5th Dist.).

{¶46} Appellant cites the case of *In re Kralik* in support of his argument. 101 Ohio App.3d 232 (10th Dist. 1995). In *Kralik*, the agency provided its expert witness with confidential investigatory material. *Id.* at 235. The expert relied on the confidential information in his testimony, but the materials were not introduced into the record or provided to appellant. *Id.* The court held the appellant in that case was denied due process because the appellant was unable to cross-examine the expert about his reliance on the report. *Id.* Like the trial court, we find *Kralik* distinguishable from the instant case. There is no indication either in the administrative record or in appellant's briefing that the Division improperly provided any of its witnesses confidential investigatory materials, nor did any of the Division's witnesses state they relied upon the Division's confidential files in preparing their testimony. Thus, we find *Kralik* unpersuasive.

{¶47} Appellant has known about the identities of both B.S. and C.B. since February of 2020, when the Division held a R.C. 1707.23 hearing. Appellant provided the names of B.S. and C.B. at this hearing as individuals who he offered the HCP investment opportunity to. The Notice does not contain either B.S. or C.B.'s full names; however, the Notice does contain the initials "B.S." and "C.B." extensively throughout. These two individuals were long-term clients of appellant. Since appellant provided these names to the Division at the February 2020 hearing, it is clear appellant had notice his actions surrounding these two individuals served as the basis for at least part of the Division's charges and they would likely be witnesses at the hearing. Appellant had more than ample time from the date of the Notice to the date of the hearing to prepare for cross-examination and, if so desired, could have utilized the procedures outlined in R.C. 119.09 to take the depositions of these witnesses and/or request the Division issue a subpoena

for these witnesses.  Further, counsel for appellant had the opportunity to do a thorough cross-examination of both B.S. and C.B. during the hearing.  We find no due process violation.

*Improperly Withholding Evidence*

**{¶48}**  Appellant contends R.C. 1707.12(C) does not protect the *Brady* materials from disclosure and thus, the Division improperly withheld *Brady* materials.  The only materials appellant alleges the Division improperly withheld from him were the exculpatory materials he requested in his March 2023 subpoena.

**{¶49}**  We first note that the trial court specifically found that if *Brady* applied in this case, *Brady* would, pursuant to the Supremacy Clause, overrule a conflicting state statute.  U.S. Const., art. VI, cl. 2.  Thus, the prohibitions contained in R.C. 1707.12(C) would not be applicable to any proceeding in which *Brady* applied.  Because *Brady* does not apply in this case, appellant fails to set forth any precedent, statute, or rule under which the Division would be required to disclose exculpatory materials, particularly in an administrative proceeding in which the discovery provisions of the civil rules do not apply. *Bennett*, 2022-Ohio-1747 (4th Dist.); *Ohio Dept. of Alcohol & Drug Addiction Servs. v. Morris*, 2005-Ohio-3053 (5th Dist.).

**{¶50}**  As to appellant's argument about R.C. 1707.12(C), appellant contends the prohibition contained in R.C. 1707.12(C) applies to records of ongoing investigation, not investigations that have been completed.

**{¶51}**  R.C. 1707.12(B) limits the Division's disclosures of information obtained through its investigations ("information obtained by the division . . . through any investigation shall be retained by the division and shall not be available to inspection by

persons other than those having a direct economic interest in the information . . . ). The Supreme Court of Ohio has specifically interpreted R.C. 1707.12(B) to prevent the Division from disclosing its investigatory file to the "target of the investigation." *State ex rel. Cincinnati Enquirer, Div. of Gannett Satellite Info. Network, Inc. v. Joyce*, 2002-Ohio-5807, ¶ 16.

{¶52} Similarly, R.C. 1707.12(C) protects law enforcement investigatory records and trial preparation materials of the Division, providing, "confidential law enforcement investigatory records and trial preparation records of the division of securities or any other law enforcement or administrative agency which are in the possession of the division of securities shall in no event be available to inspection . . . ."

{¶53} However, the prohibition against disclosure contained in R.C. 1707.12(C) contains no provision allowing disclosure after an investigation has concluded and contains no date after which confidential investigatory information must be disclosed. Appellant cites no authority for his proposition that R.C. 1707.12(C) no longer applies after an investigation has concluded. Ohio courts, including the Supreme Court of Ohio, have recognized the General Assembly intended the provision to be broad, in keeping with the unambiguous language of the statute. *Id.* (plain language of R.C. 1707.12 applies to prohibit disclosure once an investigation has begun); *State ex rel. Dublin Securities, Inc. v. Ohio Div. of Securities*, 68 Ohio St.3d 426, 432 (holding General Assembly specifically intended to provide right of inspection to consumers with direct economic interest in information, not to the target of an investigation); *Ohio Div. of Securities v. Treece*, 2022-Ohio-3267 (6th Dist.) (holding R.C. 1707.12 completely exempts the

Division's investigatory files from disclosure). We find the Division did not improperly withhold evidence.

*Adequate Notice of Fraud Claim*

**{¶54}** Appellant contends the Division failed to give him adequate notice of the basis of its fraud claim. R.C. 119.07 states, in relevant part, "[notice] shall include the charges or other reasons for the proposed action, the law or rule directly involved, and a statement informing the party that the party is entitled to a hearing if the party requests it within thirty days of the time of mailing the notice." A notice complying with R.C. 119.07 satisfies "due process requirements because it sets forth a process reasonably calculated to apprise the party of the charges against him and the opportunity to request a hearing." *Kellough v. Ohio State Bd. of Edn.*, 2011-Ohio-431, ¶ 36.

**{¶55}** Appellant essentially argues that because the precise wording of the alleged misrepresentations (money would go towards "working capital to buy tools and equipment") and because the specific circumstances surrounding the alleged misrepresentations (dates, times, places) were not contained in the Notice, he was denied due process. We disagree.

**{¶56}** After a review of the record and relevant facts, we find the Notice was consistent with R.C. 119.07 and satisfied due process requirements. The record demonstrates that fair notice of the charges at issue were given within the Notice received by appellant. The facts surrounding B.S. and C.B.'s investment with appellant in HCP are contained in the Notice. The Notice specifically contains the statute at issue and its exact wording. The Notice does not limit the Division's fraud allegations to the promissory notes only, and encompasses oral/verbal statements appellant made directly to B.S. and

C.B.  Due process "require[s] only fair notice; not perfect notice."  *Langdon v. Ohio Dept. of Edn.*, 2017-Ohio-8356, ¶ 28 (12th Dist.)  ("due process does not require the allegations pinpoint the exact date and time when an alleged incident was to have occurred"); *Bennett v. Ohio Dept. of Edn.*, 2022-Ohio-1747 (4th Dist.); *Seman v. State Med. Bd. of Ohio*, 2020-Ohio-3342 (10th Dist.).

{¶57}  While appellant contends the Division utilized appellant's verbal statements as an "alternate theory" after the hearing, the information contained in the transcript directly contradicts this argument.  Appellant knew from the very start of the hearing these statements would be at issue, as counsel for the Division argued in his opening statement that appellant's verbal statements about what the funds would be used for were knowingly false.  Further, Hitzeman testified the statements appellant made directly to C.B. and B.S. regarding the use of the funds were false statements the Division based its R.C. 1707.44(B)(4) charges upon.  Counsel for the Division specifically asked both B.S. and C.B. during the hearing about oral statements appellant made directly to them about where the funds and/or proceeds for their HCP investments were going to go.

{¶58}  Additionally, to support reversal of the trial court, the record must affirmatively show "that such error was to the prejudice of the party seeking such a reversal."  *Griffin v. State Med. Bd.*, 2011-Ohio-6089, ¶ 26 (10th Dist.).  We find no such prejudice exists in this case.  Counsel for appellant cross-examined Hitzeman specifically as to these oral statements made directly to B.S. and C.B.  Counsel for appellant also extensively cross-examined both B.S. and C.B. about these statements.  Further, counsel specifically asked appellant what he told C.B. and B.S. their investments would be used for.  Appellant responded, "I don't know that I would have been specific pointing to things.

I will say that the phraseology working capital would absolutely have been something that would have been used in the conversation." T. at 277. Appellant went on to describe what he intended the phrase "working capital" to mean, which included the "servicing of debt." Appellant presented a focused defense to these specific allegations, which centered on denials, explanations, and extensive cross-examination. Accordingly, he has not demonstrated prejudice.

*Witness and Exhibit Identification*

{¶59} Finally, appellant argues that because the Division refused to identify its potential witnesses or its exhibits until seven days prior to the hearing and did not allow appellant to view the entirety of all of the exhibits prior to the hearing, his due process rights were violated.

{¶60} On January 27, 2023, the Hearing Officer issued an entry and order setting forth modified prehearing deadlines. In that entry, the officer ordered "exchange of lists of witnesses and exhibits" by Tuesday, April 4, 2023, at 4:30 p.m. EST. Appellant never objected to this deadline. In fact, appellant filed his own witness list and list of exhibits on the same day as the Division did (April 4, 2023). Further, at no time either before or during the hearing, did appellant or his counsel inform the Hearing Officer that he needed more time to review the exhibits. We find no fundamental unfairness in the Hearing Officer's prehearing deadlines, particularly when appellant failed to object to them.

{¶61} Further, the record does not affirmatively show appellant was prejudiced. *Id.* At no time during the hearing did appellant argue he was not able to review the exhibits prior to the hearing or that this somehow prejudiced him. Appellant did not object to the admission of any of the Division's exhibits. Additionally, almost all of the exhibits the

Division set forth in their list and introduced at the hearing were either public records or records produced by appellant in response to a subpoena. The two summaries composed by Division employees introduced as exhibits were short, and were merely summaries of information provided by appellant. Additionally, appellant knew both C.B. and B.S. were involved in the Division investigation since February of 2020 because appellant himself provided the Division with their names at the February 2020 hearing.

{¶62} Upon our review of the record, appellant's first assignment of error is overruled. We find appellant had reasonable notice and a meaningful opportunity to be heard. As such, his due process rights were not violated.

II.

{¶63} In his second assignment of error, appellant argues the Division's finding that he sold nonexempt, unregistered securities is contrary to the plain text of the relevant statute. Appellant contends that since the shares of HCP were not made available to the public and were only available to a select number of investors that appellant hand-picked, the exemption contained in R.C. 1707.02(G) is applicable.

{¶64} The Division found appellant violated R.C. 1707.44(C)(1), which prohibits the sale, or offering of sale, of nonexempt, unregistered securities. There is no dispute that the HCP promissory notes were not registered. However, appellant argues the exception contained in R.C. 1707.02(G) applies. It states, "promissory notes are exempt [from enforcement under R.C. 1707.44(C)(1)] when they are not offered directly or indirectly for sale to the public."

{¶65} The Division's rules, adopted in accordance with R.C. 1707.20(A)(1) and contained in the Ohio Administrative Code, define the scope of the private-sale exemption

and limit the exemption to promissory notes sold either: (1) to officers, directors, general partners, and management of the issuing company, or (2) to not more than 10 persons during a 12-month period, where those sales meet certain additional criteria. Adm.Code 1301:6-3-02(D). The burden of establishing that the promissory notes were exempt from the registration requirements of R.C. Chapter 1707 is on appellant, because it is an affirmative defense, and he is the party attempting to claim the benefit of the exemption. R.C. 1707.45; *Mathias v. Rosser,* 2002-Ohio-2772, ¶ 27 (10th Dist.).

{¶66} Appellant does not argue his sale of the promissory notes met the criteria for the exemption. Rather, appellant asked the trial court, and now this Court, to ignore the definition contained in Admin.Code 1301:6-3-02(D) and instead adopt the broader dictionary definition of the word "public." Appellant cites to the Supreme Court of Ohio's decision in *TWISM Ent., L.L.C. v. State Bd. of Registration for Professional Eng. and Surveyors* for the proposition that a court is not required to defer to an agency's interpretation of the law, and argues the trial court and this Court should not give any deference to the agency's interpretation of the term "public." Appellant asserts we should instead adopt the ordinary meaning of the term "public" as contained in the dictionary ("open or available for all to use, share, enjoy").

{¶67} While appellant is correct that the Supreme Court of Ohio has held, "it is never mandatory for a court to defer to the judgment of an administrative agency with respect to the interpretation of a statute," the Supreme Court also stated in *TWISM* that a court "may consider an administrative agency's construction of a legal text in exercising its duty to independently interpret the law." *Id.* at ¶¶ 42-44. Further, the interpretation of

an administrative agency does "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Id.* at 47.

{¶68} Upon our independent review, we agree with the trial court that the Division's definition of the term "public" is a practical one, providing a clear line between the public and private sale of securities. Additionally, courts who have addressed the issue of how to define the term "public" as contained in R.C. 1707.44(G) have utilized the definition contained in Administrative Code. *Perrysburg Twp. v. Rossford Arena Amphitheater Auth.*, 2008-Ohio-363 (6th Dist.); *Mathias v. Rosser*, 2002-Ohio-2772 (10th Dist.); *State v. Jackson*, 1994 WL 162338 (9th Dist.); *State v. Taubman*, 78 Ohio App.3d 834 (1992) (definition of public in Admin.Code applicable to R.C. 1707.44(G)). One court has specifically held that Admin.Code 1301:6-3-02(D) properly amplifies and defines the exemption contained in R.C. 1707.44(G) and "is neither in excess of the policies behind the enabling statute under which it was promulgated nor in conflict with the legislative scheme of which it is a part." *Perrysburg Twp.*, 2008-Ohio-363 at ¶ 52.

{¶69} Appellant's second assignment of error is overruled.

III.

{¶70} In his third assignment of error, appellant makes four sub-arguments: (1) the Division used the wrong definition of "knowingly," (2) the Division failed to present evidence to support a finding that he made affirmative representations, (3) the Division failed to present evidence that would support a finding that appellant "caused" any misrepresentations to be made, and (4) the Division failed to show the statements in the promissory notes were false.

*Definition of Knowingly*

{¶71} Appellant contends the Division and the trial court erred in concluding that he knowingly failed to disclose material information to potential investors. Appellant argues this Court should adopt the definition of "knowingly" contained R.C. 2901.22(B). We disagree.

{¶72} Chapter 1707 of the Ohio Revised Code, the chapter under which appellant was found to have violated in this case, specifically provides a definition for the term "knowledge" in the securities-law context. R.C. 1707.29 provides:

> In any prosecution brought under sections 1707.01 to 1707.50 of the Revised Code . . . the accused shall be deemed to have knowledge of any matter of fact, where in the exercise of reasonable diligence, the accused should, prior to the alleged commission of the offense in question, have secured such knowledge.

{¶73} R.C. 1707.29 "has the general effect of defining 'knowingly' more in terms of 'negligently' . . . rather than 'knowingly' . . . ." *State v. Walsh*, 66 Ohio App.2d 85, 95 (10th Dist. 1979). Thus, "a person is criminally liable if he represents facts to be different than he should have known them to be if he had exercised reasonable diligence to ascertain the facts." *Id.* Ohio courts have utilized R.C. 1707.29 in non-criminal cases. *Chiles v. M.C. Capital Corp.*, 95 Ohio App.3d 485 (10th Dist. 1994) (knowledge requirement of R.C. 1707.44(C)(1) must be read in conjunction with R.C. 1707.29); *Emick v. Hawkins & Assoc.*, 2004-Ohio-6803 (7th Dist.) (applying knowledge requirement in R.C. 1707.29).

**{¶74}** We find R.C. 1707.29 should apply in this case, a non-criminal case brought by the Division under Chapter 1707. We agree with the trial court that R.C. 1707.29 provides a helpful, context-specific definition and is more appropriate than the standard criminal-law definition of knowledge. Additionally, as noted by the trial court, appellant had actual knowledge of several of the material non-disclosures, including that (1) he was being paid a salary by HCP as well as commissions to bring new investment money to HCP, (2) he had a financial interest in HCP, (3) he exercised control over bank accounts on behalf of HCP, (4) the promissory notes were unregistered securities, and (5) he was an unlicensed dealer. We similarly find no error in the trial court's conclusion that appellant could have, in the exercise of reasonable diligence, secured knowledge as to how the investor's funds would be utilized, and thus violated R.C. 1707.44(G).

**{¶75}** Appellant argues that if this Court applies R.C. 1707.29, he is entitled to *Brady* materials because R.C. 1707.29 contains the word "prosecution," and the term "prosecution" is only used in criminal cases. We disagree. Simply because appellant *could* have faced criminal prosecution under Chapter 1707 does not mean *Brady* is applicable because appellant *was not* charged criminally. The trial court did not commit error in applying R.C. 1707.29 in this case.

*Affirmative Misrepresentation*

**{¶76}** This argument centers around the Division's finding that appellant violated R.C. 1707.44(B)(4), which provides:

(B) No person shall knowingly make or cause to be made any false representation concerning a material and relevant fact, in any oral

statement or in any prospectus, circular, description, application, or written statement, for any of the following purposes:

. . .

(4) Selling any securities in this state

**{¶77}** R.C. 1707.44(B)(4) prohibits an affirmative misrepresentation, and does not apply to fraudulent nondisclosure. *Steinfels v. Ohio Dept. of Commerce, Div. of Securities*, 129 Ohio App.3d 800 (10th Dist. 1998).

**{¶78}** Appellant contends the Division failed to present evidence to support a finding that he made any affirmative representations. Appellant argues that, at most, he failed to disclose, which is not sufficient for a R.C. 1707.44(B) violation. Appellant argues the evidence demonstrates the promissory notes were created and signed by Walton, not him. Further, that the Division and the trial court's conclusions contradict the evidence produced at the hearing because he honestly believed the primary purpose of the capital raised was to purchase machines and equipment, and the Division did not trace the entirety of the funds.

**{¶79}** In this section of his argument, appellant essentially asks this Court to weigh the evidence, which is not the role of this Court. We have reviewed the record, not to weigh the evidence, but to ensure there was appropriate evidence for the trial court's decision. Despite appellant's contentions, we find there is evidence in the record to support the trial court's decision. The trial court made the following findings: (1) B.S. and C.B. recalled their conversations with appellant in detail, and their testimony was consistent with the documentary evidence; (2) appellant verbally assured potential investors, including B.S. and C.B., that their money would be used to purchase equipment

for projects HCP was allegedly engaged in; (3) a majority of the funds raised by appellant and deposited into Chase were not used to purchase equipment but were used to pay appellant and HCP's prior investors; (4) of the $925,000 deposited into Chase, $200,000 of which came from direct solicitation of B.S., $585,468.53 was paid to prior investors, over $210,000 was paid to appellant, over $24,000 was paid to Level, and only $195,000 was paid to HCP; (5) appellant was the sole authorized signatory on the Chase account; and (6) appellant negotiated a salary, plus commission on investor proceeds, for himself before he solicited funds from the investors.

{¶80} "Within the ambit of questions for law for appellate-court review [in an administrative appeal] is whether the common pleas court abused its discretion" in making its factual determinations. *City of Independence v. Office of the Cuyahoga Cty. Executive*, 2014-Ohio-4650, ¶ 14. In examining each one of the factual findings made by the trial court as listed above, we find the trial court did not abuse its discretion in making these determinations, as they accurately reflect the information contained the administrative record, including the transcript.

{¶81} We further find these factual findings provide reliable, substantial, and probative evidence of the trial court's determination that, based on the totality of the circumstances: appellant's assurances to the investors clearly conflict with how the funds were utilized, appellant would have known his statements to the potential investors were false at the time the statements were made, and appellant would have known the funds he solicited would be used for purposes other than for the purchase of equipment or machines for HCP. We also find the trial court's determination that, even if the Division did not trace the entirety of the investors' funds, appellant's statements remain false. R.C.

1707.44(B) does not require the Division to trace every investor fund for the section to apply, and the Division proved a majority of the funds deposited into Chase were used for purposes other than the purchase of equipment for HCP.

*"Caused" Misrepresentations*

**{¶82}** Appellant next contends the Division failed to present evidence to support a finding that he "caused" misrepresentations to be made because he was not the source of the statements in the promissory notes, Walton was.

**{¶83}** Appellant encourages this Court to utilize the definition of "cause to be made" contained in R.C. 2917.21(B)(1) from the Ohio Criminal Code defining the crime of telecommunications harassment. As noted above, this is not a criminal case, much less a telecommunications harassment case. Accordingly, we find any definitions contained in R.C. 2917.21(B)(1) inapplicable in this case.

**{¶84}** The trial court did not hold, as a matter of law, that appellant "caused" misrepresentations to be made via the promissory notes. Rather, the trial court found that appellee did not have to prove appellant made or "caused to have been made," the statements contained within the promissory notes because appellant's verbal statements to C.B. and B.S. are, on their own, sufficient to support a finding that appellant violated R.C. 1707.44(B)(4). We agree with the trial court. As detailed above, there is competent and credible evidence to support the trial court's determination that the facts surrounding appellant's verbal statements to C.B. and B.S. were sufficient to demonstrate a violation of R.C. 1707.44(B)(4).

*False Statements*

{¶85} Finally, appellant argues the Division failed to show the statements in the promissory notes were false because: (1) appellant had no knowledge of Walton's deception, (2) appellant thought the loans would go towards commercial, agricultural, and industrial activities and (3) consultant payments to appellant, travel expenses of appellant, and paying prior investors' interest payments are all "commercial" activity.

{¶86} As to the first portion of appellant's argument, appellant asks this Court to weigh the evidence and find his testimony credible. However, that is not the role of this Court in an administrative appeal.

{¶87} Further, as detailed above, the trial court did not rely upon the promissory notes for its determination. Rather, it based its decision on the verbal statements appellant made directly to the potential investors. There is competent and credible evidence to support the trial court's determination that the facts surrounding appellant's verbal statements to C.B. and B.S. were sufficient to demonstrate a violation of R.C. 1707.44(B)(4). Specifically, as it applies to this argument, we find the factual findings by the trial court as set forth above provide reliable, substantial, and probative evidence of the trial court's determination that appellant would have known his statements to the potential investors were false at the time the statements were made. Appellant's third assignment of error is overruled.

{¶88} Based on the foregoing, appellant's assignments of error are overruled. The May 28, 2024, judgment entry of the Delaware County Court of Common Pleas is affirmed.

By: Popham, J.,

Hoffman, P.J., and

Baldwin, J., concur

[Cite as *Henneforth v. Seidt*, 2025-Ohio-1109.]